**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA,**

               v.                                                    1:04-CR-592 (FJS)

**GEORGE DAVIS,**

               **Defendant.**

---

| **APPEARANCES** | **OF COUNSEL** |
|---|---|
| **OFFICE OF THE UNITED STATES ATTORNEY**<br>445 Broadway<br>Room 218<br>Albany, New York 12207<br>Attorneys for United States of America | **ROBERT A. SHARPE, AUSA** |
| **OFFICE OF FEDERAL PUBLIC DEFENDER**<br>39 North Pearl Street<br>5th Floor<br>Albany, New York 12207<br>Attorneys for Defendant | **TIMOTHY E. AUSTIN, AFPD** |

**SCULLIN, Chief Judge**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Defendant was indicted on December 10, 2004, on one count, which stated that he, "having previously been convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess in and affecting interstate and foreign commerce the following firearm: a BERSA, .380 caliber pistol, serial 061120. In violation of Title 18, United States Code, Sections 922(g)(1) & 924(a)(2)." *See* Dkt. No. 8.

Currently before the Court is Defendant's motion for an order suppressing tangible evidence that law enforcement officers seized during a search of his residence on July 1, 2004.[1] The Court held suppression hearings on March 29 and April 12, 2005, and reserved judgment. The following constitutes the Court's written determination of Defendant's motion.

The indictment in the instant case and the motion currently before the Court arise out of a warrantless search that State parole officers and other law enforcement officers conducted of Defendant's residence in Troy, New York, during the morning of July 1, 2004. Among the officers was New York state parole officer Mike Smith, who was Defendant's supervising parole officer.[2] Officer Smith knocked at the door of Defendant's residence. Defendant's girlfriend, Raquel Garcia, answered the door. The officers entered the residence and inquired of Defendant and Ms. Garcia whether they knew of the whereabouts of Sharon Fairley. The officers then handcuffed Defendant and began to search the residence. During the search, one of the officers found a gun under the mattress upon which Defendant had been sleeping when they entered the

---

[1] Defendant also moves to suppress statements attributed to him at the time of the search and subsequent thereto after his arraignment on state charges. During a March 11, 2005 video conference and again at the March 29, 2005 suppression hearing, AUSA Sharpe indicated to the Court and Defendant's counsel that the Government did not intend to introduce such statements. Accordingly, the Court denies this portion of Defendant's motion as moot.

Defendant's motion also seeks to compel the discovery of materials related to the decision to search his residence. However, he has subsequently indicated that the Government has provided the materials relevant to his request and that, if no other relevant materials exist, he would withdraw his motion to compel. *See* Dkt. No. 13 at Pt. 1 at 1. He has not informed the Court of the existence of any other materials that are relevant to his motion. Accordingly, the Court denies this portion of Defendant's motion as moot.

[2] Defendant was released from prison and placed on parole on October 25, 2002. *See* Dkt. No. 12 at Pt. 2 at Exhibit "A" at 1. His term of parole was to have lasted until April 24, 2006. *See id.*

residence. According to the Government, Defendant told the officers that the gun was his. Defendant was charged on a state weapons possession offense and arraigned later that day.

## II. DISCUSSION

**A.     Law governing parole officer searches**

Although the Fourth Amendment requires that searches generally be made pursuant to a warrant supported by probable cause, there are "'special needs, beyond the normal need for law enforcement'" that "'make the warrant and probable-cause requirement impracticable.'" *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (quotation omitted). The operation of a parole system is such a "special need." *See United States v. Newton*, 369 F.3d 659, 665 (2d Cir. 2004) (quotation and other citations omitted). However, despite a parolee's subjection to a greater impingement upon his privacy, "the law requires that such greater intrusions occur pursuant to a rule or regulation 'that itself satisfies the Fourth Amendment's reasonableness requirement[]' . . . ." *Id.* (quotation omitted). The question then is whether the search of Defendant's residence occurred pursuant to such a rule or regulation.

As a preliminary matter, the Court must determine which potentially applicable regulations are subject to the analysis that *Newton* prescribes. *See United States v. Newton*, 181 F. Supp. 2d 157, 162 (E.D.N.Y. 2002) (footnote omitted) (noting complication). First, the officers may have conducted the search pursuant to New York State Division of Parole regulations, which provide that "[a] releasee will permit his parole officer to visit him at his residence and/or place of employment and will permit the search and inspection of his person, residence and property." N.Y. Comp. Codes R. & Regs. tit. 9, § 8003.2(d) (2004). On October

24, 2002, Defendant signed a copy of his conditions of release that included an express consent to such searches.  *See* Dkt. No. 12 at Pt. 2 at Exhibit "A" at 1.  Although the conditions of release to which Defendant consented do not contain any apparent qualifications, the New York Court of Appeals has held that a parolee does not "surrender his constitutional rights against unreasonable searches and seizures . . . ."  *People v. Huntley*, 43 N.Y.2d 175, 181 (1977) (internal citation omitted).  However, rather than the typical standard of probable cause, where

> the search and seizure is undertaken by the parolee's own parole officer, . . . whether the action was unreasonable and thus prohibited by constitutional proscription must turn on whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty.

*Id.*  The *Huntley* court went on to

> note that the parole officer's duty has two, sometimes potentially inconsistent aspects: he has an obligation to detect and to prevent parole violations for the protection of the public from the commission of further crimes; he also has a responsibility to the parolee to prevent violations of parole and to assist him to a proper reintegration into his community.

*Id.*[3]  The Second Circuit has recognized that the rule that *Huntley* articulates "is 'coextensive

---

[3] In the instant case, the definitions of Defendant's potential parole violations are found in his general conditions of release:

> 7. I will not be in the company of or fraternize with any person I know to have a criminal record . . . except for accidental encounters in public places, work, school or in any other instance with the permission of my Parole Officer.
> 8. I will not behave in such manner as to violate the provisions of any law to which I am subject which provide for a penalty of imprisonment, nor will my behavior threaten the safety or well-being of myself or others.
> 9. I will not own, possess, or purchase any shotgun, rifle or firearm of any type without the written permission of my Parole Officer. . . .

*See* Dkt. No. 12 at Pt. 2 at Exhibit "A" at 1; *see also* N.Y. Com. Codes R. & Regs. tit. 9,

(continued...)

with the requirements of the Fourth Amendment.'" *Newton*, 369 F.3d at 666 (quotation omitted). Therefore, if the officers conducted the search in accordance with *Huntley*, the search satisfied the Fourth Amendment's reasonableness requirement.

The officers may also have conducted the search pursuant to the New York State Department of Parole's Policy and Procedures Manual ("Manual") Item 9405.04. *See* April 12, 2005 Hearing Defendant's Exhibit "A." That regulation's general policy is that

> [a] Parole Officer has the authority to conduct a warrantless search of a releasee, a releasee's residence, and other premises under the releasee's control, or property under the releasee's control, when there is an articulable reason to conduct the search that demonstrates a risk to public safety or the releasee's reintegration into the community. The Parole Officer may seize property discovered as a result of such search.

*See id.* at Policy. More specifically, the regulation provides that

> [a]n Officer may search, or direct the search of *premises under a releasee's control* including shelters, residence programs, single room occupancies and similar dwellings, when there is an articulable reason for the search and when the search is rationally and reasonably related to the performance of the Officer's duties. Prior to conducting such a search, in the absence of *exigent circumstances* or consent, the Parole Officer must confer with a supervisor and obtain supervisory approval for such search.

*See id.* at I.D.1. The regulation defines "*[p]remises under a releasee's control*" as "[a]ny place, building or part thereof capable of being owned and/or controlled by a person which reasonably appears to be under a releasee's ownership or control[]" and "*[a]rticulable reason*" as

> [a] reason based upon information which appears to be reliable and which results from: knowledge of specific facts by a parole officer, observations by said officer, communication from the releasee, or from a family

---

³(...continued)
§ 8003.2(g)-(i) (2004). At least one of Defendant's special conditions of release is also potentially applicable: "I will verify any large sums of money on my person, home or in my vehicle." *See* Dkt. No. 12 at Pt. 2 at Exhibit "A" at 2.

>>member of the releasee, or from a member of the community or other informant, or from another government agency.

*See id.* at Definitions 3, 8. Although no court has analyzed whether the present version of the Manual Item 9405.04[4] satisfies the Fourth Amendment's reasonableness requirement, in consideration of its "articulable reason," "risk to public safety" and "reintegration into the community," "rationally and reasonably related," and supervisor conferral and approval requirements, the Court concludes that a search conducted pursuant to these provisions of Manual Item 9405.04 satisfies the Fourth Amendment's reasonable requirement.

**B.    Circumstances of search**

The Court heard from two New York State Parole Officers during the suppression hearings: Neil Allen Dwyer and Mike Smith. Officer Dwyer testified that, during the weeks prior to the July 1, 2004 search of Defendant's residence, he had been trying to locate Sharon Fairley, a man whom the Troy Police Department wanted for armed robbery and for whom Officer Dwyer was seeking to execute an arrest warrant. During the three weeks prior to the search, he received non-specific information from law enforcement officers and his own confidential informant that Sharon Fairley and Defendant were possibly working together to rob drug dealers. Officer Dwyer knew that Defendant had a robbery conviction and had been involved in narcotics. Also during the course of Officer Dwyer's investigation, he received information that Mr. Fairley had been seen in a car. Using the car's license plate number, Officer Dwyer found that the car had been rented from Avis Rent a Car System, Inc. in the name of Raquel Garcia. Officer Dwyer subsequently asked Officer Smith whether Defendant was

---

[4] The present version became effective in April 2002. *See id.* at p.1.

under his supervision. When Officer Smith answered in the affirmative, Officer Dwyer informed him about the course of his investigation. When Officer Dwyer told Officer Smith that the car had been rented in Raquel Garcia's name, Officer Smith informed him that she was Defendant's girlfriend and that Defendant resided at her apartment and was named on the apartment rental agreement as an additional tenant. Officer Dwyer testified that, based upon the information gathered, he and Officer Smith agreed to conduct a search of Defendant's residence.

Officer Smith testified that, during the weeks prior to the search of Defendant's residence, he received information from a confidential informant that Defendant might be in possession of several handguns and large sums of money and that he was frequently in Sharon Fairley's company. Officer Smith stated that this informant had on several occasions provided him with information that proved to be accurate. Officer Smith also received information from other parole officers that Defendant was in the company of a wanted person. One to two weeks before the search of Defendant's residence, Officer Dwyer informed Officer Smith about the course of his investigation. At that time, Officer Smith told Officer Dwyer that Ms. Garcia was Defendant's girlfriend, and Officer Dwyer told Officer Smith that Defendant might be involved with Mr. Fairley in armed robberies. Officer Smith testified that he discussed the proposed search of Defendant's residence with his supervisor and received her consent for the search.

Both officers testified that the decision to search Defendant's apartment was a joint decision and that the officers were jointly responsible for conducting the search.

**C.    Search's compliance with applicable law**

The search of Defendant's residence complies with the New York State Division of

Parole regulations. Given the information that Officer Smith had received from his own confidential informant, Officer Dwyer, and other parole officers, he had reason to believe that Defendant might have violated his parole by fraternizing with a known criminal, possessing firearms, possessing large sums of unverified cash, and engaging in criminal conduct, namely armed robbery.[5] The commission of such acts would reasonably raise concern about whether Defendant posed a threat to commit further crimes that might injure the public and whether he was successfully reintegrating into the community.[6]

The search also complies with Manual Item 9405.04. The information that Officer Smith possessed satisfied the "articulable reason" requirement because it consisted of his own knowledge of Defendant's criminal record and apparently reliable communications that he received from his confidential informant, Officer Dwyer, and other parole officers. The content of the information that Officer Smith received allowed him to form an "articulable reason" for the performance of his duties of protecting the community from Defendant's commission of any further crimes and of assisting Defendant in successfully reintegrating into the community.

Therefore, the Court find that, because the officers conducted the search of Defendant's residence pursuant to regulations that satisfy the Fourth Amendment's reasonableness

---

[5] Defendant questions the information upon which Officer Smith testified that he relied. He questions why Officer Smith did not personally confirm the facts that others communicated to him. However, the Supreme Court has already determined that it is "reasonable to permit information provided by a police officer, whether or not on the basis of firsthand knowledge, to support a probationer search." *Griffin*, 483 U.S. 879-80 (internal footnote omitted).

[6] Although there is no basis for questioning whether Officer Smith sought and executed the search for the proper motives, such questioning would be irrelevant regardless. *See United States v. Knights*, 534 U.S. 112, 122 (2001) (quotation omitted) (holding that, consistent with general Fourth Amendment principles, a probation officer's official motivations for conducting a search are not relevant).

requirement, the evidence that they seized as a result of the search is admissible.

### D.     Presence of officers other than Officer Smith

Defendant, however, raises a further contention against the admissibility of items that the officers seized during the search of his residence. His essential argument is that the participation of Officer Dwyer, other parole officers, Deputy United States Marshals, State Police officers, and Troy Police Department detectives in the search rendered the search unlawful. Although he claims that he is not making a "stalking horse" defense, that appears to be precisely what he is seeking to do. The theory of the "stalking horse" defense is that it is improper for a parole officer to conduct a warrantless search "'on prior request of and in concert with law enforcement officers.'" *United States v. Reyes*, 283 F.3d 446, 463 (2d Cir. 2002) (quotation and other citations omitted). The Second Circuit has expressly rejected this theory, *id.*, and noted that

> the objectives and duties of probation officers and law enforcement personnel are unavoidably parallel and are frequently intertwined. Indeed, it is difficult to imagine a situation where a probation officer conducting a home visit in conjunction with law enforcement officers, based on a tip that the probation officer has no reason to believe conveys intentionally false information about a supervisee's illegal activities, would not be pursuing legitimate supervised release objectives.

*Id.* (internal footnote and other citations omitted). Therefore, because Officer Smith possessed information that indicated that a search of Defendant's residence would be reasonably related to his supervision duties, the presence of other officers does not render the search unlawful.

### III. CONCLUSION

After carefully considering the file in this matter, the evidence offered at the suppression hearings, the parties' submissions and oral arguments, and the applicable law, and for the reasons stated at the suppression hearings and herein, the Court hereby

**ORDERS** that Defendant's motion to suppress is **DENIED** in all respects.

**IT IS SO ORDERED.**

Dated: August 18, 2005
    Syracuse, New York

                                        Frederick J. Scullin, Jr.
                                        Chief United States District Court Judge